IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 3, 2025 Session

## TOM SLAGLE ET AL. V. CHURCH OF THE FIRST BORN OF TENNESSEE ET AL.

**Appeal from the Chancery Court for Robertson County**
**No. CH11-CV-10274      Ben Dean, Chancellor**

___

**No. M2024-01389-COA-R3-CV**

___

In protracted litigation concerning a dispute over church property, a new chancellor took office several years after a jury verdict, post-trial motions, and an order granting partial summary judgment. The new chancellor set aside the jury verdict and the summary judgment order. We have determined that, under the unique circumstances of this case, the trial court erred in setting aside the jury verdict and in setting aside the order granting partial summary judgment. Therefore, we reverse and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JEFFREY USMAN, J., joined.

J. Thomas Smith and Philip L. Robertson, Nashville, Tennessee, Keith Jordan, Goodlettsville, Tennessee, and Heather Elyse Tackett, Springfield, Tennessee, for the appellants, Church of the First Born Association, Chester H. Cole, Kelvin Gregory, Jon James, Billy H. Ray, Roger Ray, Tom Slagle, and Michael Spears.

Tonya Jenkins Austin, Larry Lamont Crain, and Joshua Ray Denton, Brentwood, Tennessee, for the appellees, Church of the First Born of Tennessee, Inc., David Adamson, John Edward Andrews, Helen Andrews, Brenda Barber, Roger Brewer, Jason Broadway, Randy Cline, Naomi Cooper, Joe David Cron, Dayspring Academy, Chad Hardin, Larry Hardin, Daphner Harms, Calvin Harrison, Jennifer Harrison, Mark Henderson, Danny Hinson, Tim Hunter, Heather Martin, David Mayhew, Jon Mayhew, Kellye Mayhew, Theresa Nix, Terry Nix, Esther Poole, Jamie Summers, Dale Suttle, Frances Winters.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

This matter concerns the ownership of church property in Robertson and Trousdale Counties. Multiple lawsuits have been filed regarding the dispute since 2011, and this Court has previously issued two opinions on these suits.

The Church of the First Born of Tennessee ("the COFB" or "the Church"), an unincorporated association, was originally formed in 1933 by Prator Donald "P.D." Hardin. Elder P.D. Hardin was the COFB's elder/overseer, which meant that he served as the pastor and spiritual leader of the church. Elder P.D. Hardin led the construction of the church's first building in New Deal, Sumner County, Tennessee in 1936. Later, the COFB also had congregations meeting in Hartsville (Trousdale County), Portland (Sumner County), and Nashville (Davidson County). By the 1980s, the COFB had only two locations: Hartsville (Trousdale County) and White House (Robertson County). The elder/overseer appointed a board of seven deacons whose authority extended to all of the church's congregations. (As will be discussed below, the role of the deacons became a point of contention between the parties once the church split into factions.) P.D. Hardin served as elder/overseer of the Church until his death on September 19, 1983.

Prior to his death, P.D. Hardin selected his nephew, Bob C. Hardin, to succeed him as elder/overseer. During Bob Hardin's tenure as the elder/overseer, the Church began construction of a private Christian school, Dayspring Academy ("the Academy"), on land in Robertson County adjoining the White House sanctuary. The school opened in August 2006. Elder Bob Hardin died in 2008 without naming a successor elder/overseer. Prior to his death, Elder Hardin was not always able to lead services, and he selected Robbie Kline to act as pastor of the Hartsville congregation and Roger Brewer to act as pastor of the White House congregation.

After Elder Bob Hardin died, disagreements arose among the members of the COFB. *See Slagle v. Church of the First Born of Tenn.*, No. M2015-00297-COA-R3-CV, 2017 WL 3382800, at *1-2 (Tenn. Ct. App. Aug. 7, 2017) ("*COFB II*") (detailing the circumstances surrounding the church schism). Increasing tension developed between those worshipping in Hartsville and those worshipping in White House. One point of contention was the substantial costs associated with operation of the Academy. The situation reached a boiling point in August 2010 when Pastor Brewer circulated a statement of faith. Two of the deacons, Ed and Mickey Andrews, signed the statement, but the remaining five deacons declined to do so. Tom Slagle, the chair of the deacons, led the Hartsville faction, and Pastor Brewer led the White House faction. Pastor Brewer nominated a new slate of deacons, including Ed and Mickey Andrews, and a new church secretary for the White House church. On November 21, 2010, members attending in White House voted to affirm Pastor Brewer's nominees. That same Sunday, Mr. Slagle presented

the members attending in Hartsville with a set of bylaws purportedly written by Elder P.D. Hardin, and those present signed a statement ratifying these alleged foundational bylaws.

As a result of this split in the Church, there arose a dispute over ownership and control of the Church's property in Robertson County and Trousdale County:

> In Robertson County, the White House sanctuary sits on approximately 17.6 acres. The property was acquired in May 1972 using funds raised by the Church's ladies auxiliary. The Dayspring Academy campus and a church-operated campground, known as Camp Le'Prat, sit on a larger tract of land, which was formerly known as the "Neal property." Acquired in February 1969, P.D. and Lela Hardin, Chester and Evelyn Cole, Aubrey and Betty Gill, and Billy and Barbara Ray purchased the Neal property for $65,000. They then deeded the property to trustees for the use and benefit of the Church. The surviving grantors claim they retained a right of first refusal should the property ever be sold.

> Between 1973 and 1998, the Church acquired interests in several other significant tracts of land in Robertson County. . . .

> In Trousdale County, the Church has an interest in two lots: an improved lot of 3.542 acres, which includes a sanctuary, and an adjoining lot of 2.12 acres. The sellers of the property on which the sanctuary sits, David and Theresa Parker, placed two restrictions in the deed. First, the property was "to be used for church purposes or church charity purposes only." Second, the Parkers retained "the right of first refusal" if the property was ever sold.

*Slagle*, 2017 WL 3382800, at *3-4.

The parties filed lawsuits in Robertson and Trousdale Counties over control of the Church property. The Church of the First Born of Tennessee, Inc. ("the Corporation"), a corporation formed by Roger Brewer after the church split in 2010, filed suit in Trousdale County chancery court against a group of defendants headed by Tom Slagle ("the Slagle parties") to quiet title to the church properties in Trousdale County. The trial court granted the defendants' motion for summary judgment, concluding, in part, that the election of deacons in the White House location was invalid because the Church's practice was for the elder/overseer to appoint deacons. In *Church of the First Born of Tennessee, Inc. v. Slagle*, No. M2014-01605-COA-R3-CV, 2017 WL 2555671, at *6-7 (Tenn. Ct. App. June 13, 2017) ("*COFB I*"), this Court determined that the COFB, the unincorporated association, retained title to Church property and that "the Corporation lacked standing to bring the claims asserted in its complaint." We, therefore, reversed the decision of the trial court and remanded the case with instructions for the trial court to dismiss the case. *Id.* at *7.

In the most recent decision of this Court, *COFB II*, we considered two consolidated lawsuits filed in Robertson County brought by the Slagle parties against the COFB corporation and the Academy to quiet title and for various other claims, as well as counterclaims filed by the defendants. *COFB II*, 2017 WL 3382800, at *4. The trial court granted summary judgment in favor of the Slagle parties. *Id.* at *5. In its order, the trial court made conclusions of law and factual findings, including a determination that, prior to the split, the COFB's organizational structure was more connectional or hierarchical, rather than congregational, because of the "centralized decision making powers vested in a single Elder/Overseer and the Board of Deacons appointed by him without any congregational vote or confirmation." *Id.* On appeal, this Court affirmed the trial court's denial of a summary judgment motion filed by the Corporation and the Dayspring Academy based upon this Court's determination that these parties lacked standing. *Id.* at *8.

Regarding the cross-motions for summary judgment, this Court reversed the trial court's grant of summary judgment to the Slagle parties and remanded for further proceedings. *Id.* at *9. We stated as follows:

> In examining the trial court's ruling, we agree that the undisputed facts show that "all Robertson County real estate at issue in this case was held in the name of or by Trustees for the benefit of The Church of the Firstborn, an unincorporated association." But beyond that there are disputed issues of material fact that preclude the grant of summary judgment to the Slagle Plaintiffs.
>
> The Church Corporation and Dayspring Academy argue that "control over the Church's real property require[d] a congregational vote." In support, they cite to specific examples of congregational votes taken before a property transfer. But they have also stated that "the Church ha[d] employed a number of methods when making real property decisions," including "(i) by congregational vote upon the recommendation of the Elder, (ii) by congregational vote upon a vote of recommendations by deacons, and (iii) for minor Church properties, by vote of the deacons upon recommendation of the Elder."
>
> The Slagle Plaintiffs argue that the bylaws allegedly drafted by Elder P.D. Hardin "vest[ed] all business authority in the Board of Deacons." Beyond the bylaws, they argue that there was "a consistent practice of votes [by the Board of Deacons] to approve property transactions." And, contrary to the factual assertion of the Church Corporation and Dayspring Academy, they submit Church records establish "consistent practices" for dealing with property. They acknowledge that Church member votes took place but claim those only occurred after deacon approval. According to the Slagle Plaintiffs,

- 4 -

the only instances "of self-autonomous congregational authority" occurred with the sale of properties where members worshiped, which required approval by "a super-majority (two-thirds) of any individual congregation" impacted.

Although we remand the case for a determination of whether the Church was hierarchical or congregational, we note that a determination that the Church was congregational in some respects would not preclude a determination that the Church was hierarchical for other respects. *See* [*Convention of Protestant Episcopal Church in Diocese of Tenn. v. Rector, Wardens, & Vestrymen of St. Andrew's Par.*, No. M2010-01474-COA-R3-CV, 2012 WL 1454846, at \*17 (Tenn. Ct. App. Apr. 25, 2012)]; 77 C.J.S. *Religious Societies* § 8. Under our case precedent, to require a congregational vote, the church must be congregational for purposes of ownership and control of property. As our supreme court explained, in a congregational church, the will of the majority determines the outcome "*unless there be shown some law, regulation, rule, or practice of the church determining otherwise.*" *Nance [v. Busby]*, 18 S.W. [874,] 875 [(Tenn. 1892)] (emphasis added).

*Id.* at \*9 (footnote omitted).

On remand, in Robertson County chancery court, the Slagle parties filed a motion for partial summary judgment as to the remaining claims in the two consolidated cases ("the 2011 case").[1] Moreover, a group of Church members headed by Roger Brewer ("the Brewer parties") filed a new action to quiet title, CH18-CV-487 ("the 2018 case"), against the Slagle parties. The trial court denied the Slagle parties' motion for partial summary judgment in the 2011 cases as well as their motion to dismiss the 2018 case. The trial court later granted the Brewer parties' motion to consolidate the 2011 cases with the 2018 case. The court also entered an order bifurcating the jury trial into two parts. The first part was on the sole issue of "whether the church at issue in this Consolidated Action was congregational or hierarchical at the time of the church split on November 21, 2010."

## Jury trial

A jury trial occurred over six days between August 19 and August 27, 2019. Both sides put on extensive proof regarding the Church's governance practices and the acquisition of property over the years. The Slagle parties presented the testimony of Evelyn

---

[1] The two consolidated cases are: CH11-CV-10702, *Tom Slagle et al. v. Church of the First Born of Tennessee, a Tennessee Corporation et al.*; and CH11-CV-10274, *Tom Slagle et al. v. Roger Brewer et al. as agents for the Church of the First Born of Tennessee, a Tennessee Corporation et al.* In light of this Court's decision in *COFB II*, the defendants in these cases obtained a voluntary dismissal of their counterclaims.

Cole, the daughter of Elder P.D. Hardin, who served as the Church's secretary, attended deacons' meetings and recorded the minutes, and was a signatory on the Church's checks. She testified that the board of deacons was in charge of the business of the Church and that no purchase or sale of property occurred without action by the board of deacons. Counsel for the Slagle parties reviewed many of the minutes with Ms. Cole.

Counsel questioned Ms. Cole about Exhibit 63, the minutes from a deacons' meeting on September 24, 1993, at which Mickey Edwards and Tom Slagle were presented by Elder Bob Hardin as new members of the board of deacons. The minutes include the following remarks made by Elder Bob:

> I believe that these two men are very humble men. From this day forward, you[r] voice is just as strong and your vote is just as strong as the rest of them. Are there any questions before I leave?

> You deacons are helpers and assistants. They do not have a final say. They are helps and assistants. When I wanted something done, some of you all have said you are not going to do it. That is why lately, I have gone ahead and done some things. You don't have the authority to do that. I wanted a barn and the next thing I heard, you said [we] are not going to do it. If you can show me reasons why we should not do that, then I may reconsider. The deacon board does not have that authority. As long as I pray and seek God, then I will not have that. Another thing; the deacons are not over the treasury. You have access to it and you have a right to do what needs to be done. But to say that you are over the treasury; that is the wrong thing. There is nothing in the scriptures to say that they are over the treasury. That would mean that you are over me. I am just setting these things in order. The deacons are not over the treasury. They are my assistants to do whatever needs to be done. If you have any questions, I will be happy to answer.

One of the deacons pointed out that, in August 1991, Elder Bob had said that "the deacons can do anything." There followed an exchange between individual deacons and Elder Bob about various building projects, including an amphitheater, and bids on purchases for the Church. Elder Bob expressed frustration about projects being abandoned or taking too long and a lack of communication; he insisted that such decisions needed to be made in the deacons' meetings. Ms. Cole did not know specifically why Elder Bob had become so upset about the amphitheater. She stated that nothing really changed about the Church operations after that meeting. Elder Bob did not take control of the checkbook or even put his name on the bank account.

At a deacons' meeting on July 25, 2006, Elder Bob spoke to the deacons about the Church's financial problems related to the Academy. The deacons voted unanimously to sell some church property and use the proceeds to pay down the $1.4 million loan taken

out to finance the Academy. Tom Slagle asked whether the matter should be taken to the congregation. Elder Bob did not wish to present the decision to the congregation and stated, "the deacons are the ones to take care of the business and not the trustees." Elder Bob further emphasized that the deacons were in control of the money at the Academy, although he thought that "the deacons need to set a small amount of money that they [the Academy] can spend without coming to the Board of deacons."

The deacons met on March 16, 2008, shortly after Elder Bob's death. At the beginning of that meeting, Elder Bob's wife, Mary, and son, Tim, made some remarks to the deacons:

> Tim spoke first regarding the deacons and he said that his Dad, Bro. Bob Hardin, laid the foundation and he believed in order. The leader was in charge, and the seven men are over the finances. There were two helpers, one at Hartsville, and one at White House. They answered to him. I know the seven men were put in charge. That is what he wanted. This is what he said. We are in a struggle, but I feel really good about it. I have confidence that things will be worked out. I think you all will figure out what to do. If you make changes, I will know that you all are in control. My job is to put in the offering. You people are the stewards of God's money. Feelings will be hurt, I am sure, but I don't want the deacons to get their personal feelings mixed up with God's business. This is what he said to my mother. You are facing more than you know.

> Sis. Mary then spoke up and said she agrees with what Tim just said. She said that Bob loved every one of the deacons, and the decisions were made for God's work.

> Tim said he loves the church, and he puts his money in, and we have to do what is best. He remembered that he had been in church for fifty years. He said whatever program we implement, natural or spiritual, he is behind it 100%.

Mary and Tim Hardin left the meeting after making their statements to the deacons.

Ms. Cole also testified about the role of the trustees, who were elected by vote of the congregation. She stated that the trustees' job was only to sign on behalf of the Church on deeds and other documents as directed by the deacons. The trustees did not negotiate on behalf of the Church.

Ms. Cole had also taken minutes for the congregational meetings since the beginning of the Church. She explained that the typical practice was for the Church deacons to decide whether to buy or sell property and then present it to the particular congregation

- 7 -

if necessary. She stated that, for a congregation vote, the typical procedure was a show of hands, not ballots. On September 16, 1963, there was a called meeting of the Portland congregation "for the purpose of selling the building and lot," and all members present voted to sell the church according to the terms presented. There was a similar meeting in 1969 for the purpose of purchasing property on Meridian Avenue in Nashville. There was a vote in Hartsville on May 1, 2002, concerning the sale of three lots to the Trousdale County Board of Education, which passed unanimously. Ms. Cole believed that both congregations approved this sale because they were selling to the State, and the State required that approval.

Billy H. Ray, who had served as a deacon and church treasurer for more than sixty years and continued in those roles at the time of the hearing, testified that the deacons always made the decisions to buy or sell property. The deacons would consult with the elder/overseer, who attended most of their meetings. Mr. Ray testified that the congregation would sometimes vote on property sales or acquisitions, but that was not the general practice. Any congregational vote was usually taken only at the affected location. When asked when the congregation was asked to vote, Mr. Ray cited examples, such as the sale of the old Hartsville church building. Ms. Anderson donated the property to the church and included a requirement in the deed that there must be a two-thirds majority vote before the building could be sold. Mr. Ray also mentioned the sale of church property to the board of education, which wanted a two-thirds majority vote.

Counsel also questioned Mr. Ray about his role as treasurer and the church bank accounts. He testified that, at one time, each congregation had its own bank account; in the 1980s, the church accounts were combined into one account. Either way, the board of deacons had to approve all spending, and Mr. Ray could write checks from the appropriate account. In the entire time he served on the board of deacons, Mr. Ray testified, he did not recall any money being spent without a vote of the board of deacons. Two signatures were required on each check. Neither P.D. Hardin nor Bob Hardin, the elder/overseers, ever signed a check. As far as Mr. Ray was concerned, the board of deacons was in charge of the treasury. Trustees signed deeds at the direction of the board of deacons. Mr. Ray testified about the Church's financial problems related to the Academy. At one point, the Academy was "taking about 90 percent of everything that the church took in."

On cross-examination, Mr. Ray was questioned about many of the Church's property transactions. Counsel also asked Mr. Ray to clarify the role of the elder/overseer and the deacons. According to Mr. Ray, Elder Bob did not attend all deacons' meetings, and the deacons did not need his approval on property decisions. He further stated that the deacons were over the Academy, the pool, the farm, and the amphitheater. Counsel asked Mr. Ray to explain the comments made by Elder Bob at the September 1993 meeting (quoted above). Mr. Ray acknowledged that Elder Bob had made such statements about the role of the deacons at times. Mr. Ray testified that, before he died, Elder Bob "called the deacons to come to the hospital and he reversed that."

- 8 -

On redirect, Mr. Ray recalled in 2006 when Elder Bob told the congregation that the deacons were in charge of the finances. In 2006, Elder Bob also told the board of deacons they were in charge of the Academy.

Kelvin Gregory, a deacon appointed by Elder Bob, testified about his experience on the board of deacons. His testimony was consistent with that of Ms. Cole and Mr. Ray. Mr. Gregory testified that the deacons controlled the church's property and took care of church business. As to the trustees, Mr. Gregory stated that their role was to "go and transfer the property after the deacons decided to do so." Trustees were elected by the congregation. Asked about the sale of church property in Trousdale County to the board of education, Mr. Gregory stated that a congregational vote was held because the board of education required one. He did not recall any time during his service as a deacon when the congregation was asked to approve a purchase of property. On cross-examination, Mr. Gregory agreed that Elder Bob gave direction on some matters, such as the sale of property to pay down the school loan in 2006.

Tom Slagle, chair of the board of deacons (and son-in-law of Evelyn Cole), gave lengthy testimony. He joined the Church in 1974 and was appointed a deacon in 1993. Mr. Slagle would call the deacons' meetings. Elder Bob did not attend all of the meetings, but he would take charge when he was there. Mr. Slagle stated that the elder/overseer did not vote in the deacons' meetings. He did not recall the elder/overseer ever overruling the vote of the board of deacons. Mr. Slagle stated that the elder/overseer was in charge of the church's doctrine and theology, topics that were not discussed at deacons' meetings. The board of deacons, he said, took care of the business of the church, including property transactions. With regard to the occasional congregational votes on the sale of property, Mr. Slagle stated that these votes were typically conducted by a show of hands, with no actual counting of the number of votes, and were an affirmation of the deacons' decision. The authorization of the board of deacons was required before any vote went to the congregation.

Mr. Slagle was asked about Elder Bob's statements at the deacons' meeting in September 1993 concerning Elder Bob's authority over the deacons. That meeting occurred on Mr. Slagle's first day as a deacon, and he did not know the reason for Elder Bob's irritation that day. He testified that, after that day, Elder Bob did not take charge of the treasury and "things did not change." Mr. Slagle described the Church's financial problems related to the Academy. He noted that, at the deacons' meeting where they were discussing selling property to pay down the loan, Elder Bob did not want to take the matter to the congregation and stated that the deacons were in charge of the church's business. Further, Elder Bob made clear that the board of deacons was in charge of the Academy. Referencing Elder Bob's statements back in September 1993 concerning his authority over the board of deacons, Mr. Slagle stated that Elder Bob was in failing health in 2006 and had changed his mind by then.

Between 2006 and 2008, Elder Bob appointed ministers to serve at the two church locations. These ministers would act when Elder Bob was not able to hold services. Mr. Slagle testified about the deacons' meeting the first month after Elder Bob's death, which was attended by Sister Mary Hardin and her son, Tim. He affirmed the contents of the minutes (detailed above) describing how Elder Bob wished the church to operate after his death. Before and after Elder Bob's death, the board of deacons was in charge of the Church's business affairs. Prior to his death, Elder Bob was in charge of the spiritual and theological affairs; after his death, the two pastors he appointed, one in White House and one in Hartsville, were to lead the congregations spiritually.

Mr. Slagle answered questions about changes over the years within the Church concerning the name under which members were baptized. He was also asked about a set of so-called "bylaws" alleged to be in the handwriting of Elder P.D. Hardin. Mr. Slagle became aware of the existence of these bylaws in 2008 when Ms. Cole told him about them. In Mr. Slagle's view, the bylaws provided for the appointment of a new elder/overseer by the board of deacons. He did not make the bylaws available to the other deacons until sometime in November 2010. Mr. Slagle considered the bylaws a governing document that was consistent with the Church's practices over the years. In Mr. Slagle's opinion, Roger Brewer had attempted, in November 2010, to claim the position of elder/overseer without any authority to do so.

Several other witnesses testified briefly for the Slagle parties and generally echoed the testimony of the other witnesses regarding the roles of the elder/overseer and the board of deacons. Roger Ray, the son of Billy Ray, testified that he had been in the church all of his life and had been baptized in 1968. He acted as an usher and was a scoutmaster at the Church. Michael Spears served as an usher in the Hartsville church and was elected trustee in approximately 2010.

At the end of the Slagle parties' proof, the Brewer parties moved for a directed verdict, which the trial court denied. The Brewer parties then proceeded with their proof.

Ed Andrews testified that he was part of the third generation of his family to be part of the Church. He and his wife bought a home in Mill Creek Heights, a subdivision in Robertson County established by the Church for its members. Mr. Andrews emphasized the family nature of the Church and the many gatherings of the members at the church campground over the years. Mr. Andrews served on the steering committee that considered the feasibility of establishing the Academy and on the Academy's board of directors. He became a deacon of the Church in 2007. He recalled both elder/overseers referring to the deacons as being helpers and assistants.

Mr. Andrews disagreed with Tom Slagle's characterization of the authority of the deacons. He testified that the deacons had some financial responsibilities and were "supposed to take care of the needs and assist." He did not vote in favor of the board of

deacons' decision to "take control" of certain matters of the Church in 2010. According to Mr. Andrews, "Brother Roger Brewer was who was leading the church at that time." He saw a change in how some of his fellow deacons approached their role after Elder Bob's death.

Mr. Andrews was questioned extensively about many of the property transactions over the history of the Church and how they took place. He recalled that when church property was sold in Trousdale County in 2002, congregational votes were taken in Hartsville and White House. Counsel asked Mr. Andrews how the congregation would show its approval for property transactions. He stated that "sometimes it was an 'amen' or, you know, affirmation, I guess you would say. Sometimes it was by a show of hands. . . every time wasn't exactly the same." With the 2006 sale of Robertson County property, there was a formal balloted congregational vote.

On cross-examination, Mr. Andrews could not say whether the board of deacons always voted first on property transactions. Mr. Andrews testified as follows concerning how he thought Roger Brewer's position changed:

Q. Now, at some point, did Roger Brewer's position in the church change?
A. From my perspective, it did.
Q. Okay. When was that?
A. At a time in which we felt like he was ordained as the elder overseer.
Q. And how was he ordained as elder overseer?
A. We felt like God ordained him as the elder overseer.
Q. You didn't have an election?
A. No, sir.
Q. God ordained him how?
A. God ordained him through prophetic prophecy.
Q. Okay. Is that prophetic prophecy from your wife?
A. Multiple people, thank you.
Q. Who else?
A. David Adamson. Sister Helen Cron.
Q. Okay. Was there any action by the congregation individually or collectively to confirm that prophetic appointment by God?
A. We didn't have to.
. . .
Q. So when God anointed Roger Brewer elder overseer, did that make Roger Brewer in charge of the entire church?
A. You can only lead those that will be led. The vast majority of the people who were attending that location on a regular basis gladly followed.
Q. Did God anoint him head of the Hartsville congregation?
A. Again, you can only lead those that will follow.

Q. Okay. Did Roger Brewer accept the authority of the Board of Deacons over the business of the church as Brother Bob did?

A. Brother Roger was hand and glove involved with the church and with – you're talking about preDecember – I mean, preNovember 21, '10?

Q. Yes.

A. Brother Roger never asked that any of the decisions to do with the business affairs that we were doing at that point, never did he disagree that we should continue to make the changes we discussed.

Roger Brewer testified that he had been part of the Church since 1982. He began filling in for Elder Bob in 2005 or 2006 and took over the White House pulpit full-time in 2007. After Elder Bob's death in 2008, Mr. Brewer tried to continue leading the people in the same spirit manifested by Elder Bob. When asked to describe the church governance, Mr. Brewer opined, "It is 100 percent a biblically based congregation church." He emphasized that congregational support was "absolutely necessary" for him to take the "next step of leading the flock." Mr. Brewer further testified:

So as has been testified, I never stood out and said, "Hey I'm the leader." I wouldn't do that. Wouldn't have to do that. I was to keep preaching the word and shepherding that flock to the best of my ability, holding to the doctrine of the church. And then that was business—I knew that God had dealt with me. I was convinced completely that God had called me. But in order for that to be effective in the Church of the Firstborn, the congregation had to know that. And the vast majority of the congregation believes that.

When asked what body in the Church had ultimate authority to "finally approve the sale or purchase of sanctuary property," Mr. Brewer opined:

It's absolutely the congregation. And might I add, if the congregation did not vote, it was –if there was a case that there wasn't a vote, the authority was the support the congregation gave the elder overseer.

He stated that the deacons lacked the authority to dispose of church-owned property in Robertson County without a congregational vote. Mr. Brewer heard the testimony about the deacons being in control of the affairs of the church and stated that "it's absolutely false."

Mr. Brewer stated that after Elder Bob's death, some in the Church supported "the uprising." He testified:

It was very disruptive. I felt like the vast majority of the congregation did a very good job of being quiet, trying to stay out of it. But it became very serious from my standpoint as the one that's shepherding the flock—and I

see mothers running out with children crying—something had to be done. It was made—the testimony sounded like it was the church members that were doing it. When actually the disruption had to do with this faction, and/or some people in that faction, and so I tried to take steps to rein that in.

Counsel asked Mr. Brewer if it was possible the Church might dismiss him as pastor. He responded: "They would have if they could have . . . but the congregation would have never accepted that."

On cross-examination, Mr. Brewer was asked when he became a "pulpit minister":

A. That's not a term that we use. I became an elder in early 2000s. When I—I'm not sure what you're referring to by "pulpit minister." If you're an elder and you feed the flock, you go behind the pulpit and you preach.
. . .
Q. Would you prefer the term "overseer"?
A. I don't have a problem with that either, no.
Q. Okay. Now, I think that was your next answer [in his deposition] to carry on the role of overseer of the congregation—
A. That's right.
Q. –is that term I used in the next line [of Mr. Brewer's deposition]?
A. Yes.
Q. So I'm not going to talk about a pulpit minister anymore. I'm going to talk about overseer, if that's all right?
A. Yeah. I think they can be interchanged.
Q. I'm not trying to trick you. I just want to make sure we're on the same page.
A. Yes, sir. And I'm trying to follow.
Q. Okay. So in 2007, you became overseer of the White House congregation. Did that require an ordination?
A. Yes.
Q. Okay. When did the ordination occur?
A. June 25th, 2006. But technically the appointment—and again that's a little confusing terminology, and I don't want someone to be confused. "Ordained" or "appointed" are one and the same. Appointed is when you're put in a position. We look at another phase of that as when the elder lays hands on it, it's biblically referenced, and prays for one. That took place June 25th, 2006.
Q. Okay. And were you appointed or ordained to a particular congregation of the church?
A. No.
Q. Okay.

A. It's just an ordination of an elder overseer feeding the flock, shepherd. The position in the ministry.

Mr. Brewer's testimony was often rambling and confusing, particularly regarding the authority of the pastor or "overseer" at a particular location and the elder/overseer over the entire church. He agreed that the elder/overseer appointed "overseers," and that the elder/overseer or the board of deacons appointed every other position in the church, except the trustees, who were elected. He agreed that "the man who appoints can remove," but added that this was true "as long as they have the authority of the congregation, the 'support' is a better word for that, then the congregation would follow those removals or appointments." Mr. Brewer stated that he believed God appointed him head of the Church of the Firstborn. He testified: "There were factions under Brother Bob as well. But the majority supported them. So those factions left."

Counsel for the Slagle parties tried to pin Mr. Brewer down as to when, in his view, he became the church's elder/overseer:

Q. When you came to the position of elder overseer, when was that? Before November 21st, 2010 or after?
A. Mr. Jordan, you're going to–to some people it was before. To some people they heard things Brother Bob said and they believed it beforehand. To some people, it came later as they felt the power of God. That is—that's the congregation to follow that. And it's different times that people felt that. That's why the activities that happened in November of 2010, it's one of the reasons I did it the way I did.
Q. Well, then let me ask you this question: Under whose authority did you send a letter to the congregation of the White House—excuse me—to the White House congregation of the Church of the Firstborn claiming authority to hold an election for—for a new Board of Deacons who were appointed by someone you recognized as someone in authority, and the new church secretary, someone who was appointed by someone whom you recognized as an authority? How were you able to do that unless you had assumed or you presumed you had the authority to start removing people who were put in place by individuals who had the authority to put them into place?
A. It was directly in line with the history of the church. People had decided not to follow the church doctrine. I gave you an example. It was very similar. It came time to move the church forward. And that's—I had the authority as the overseer shepherd of that congregation.
. . .
So my responsibility at that time was to protect the flock there [in White House]. Mr. Jordan, it was—there was a lot going on in that faction. I could---I could act to calm down the uprisings and the things that were going on within the White House congregation. And it was my job to hold anyone

- 14 -

that was in any position in the church, just as Brother Hardin did and Brother Bob did, to the doctrine of the church.

And so, yes. I did select five new deacons and a secretary. I think all of those, I believe, have testified under oath that, yes, they did believe a new baptism formula. And I put those before the congregation the way that I did.

Mr. Brewer acknowledged that, at the meeting in White House on November 10, 2010, seven people were elected deacons. Ed and Mickey Andrews were already deacons and had taken Mr. Brewer's statement of faith to a deacons' meeting, where the remaining deacons declined to sign it. Therefore, Mr. Brewer dismissed those five deacons and elected five other people at the congregational meeting on November 10, 2010. Mr. Brewer did not send the five original deacons a letter or notice of their dismissal but believed that they understood because "[t]hey held a meeting the same day and adopted the bylaws." He admitted that he dismissed five deacons who had been appointed by Elder P.D. Hardin or Elder Bob Hardin to have authority over all congregations of the Church. He stated, "If someone does not uphold the very basis of salvation of the church, they will always be removed."

Mark Henderson, a long-time member of the Church, testified about his memories of congregational votes and about his understanding of how the Church was governed. He believed that the deacons assisted the leader of the Church and that purchases and sales of property were determined by a vote of the congregation. He had no knowledge that the board of deacons voted on such decisions. Mr. Henderson never served on the board of deacons. Helen Andrews, who was a member of the ladies' auxiliary committee, also gave brief testimony. She stated that the ladies' auxiliary did not need to request permission from the deacons before they spent the funds that they raised.

The jury was asked to answer a single question:

For the period ending November 21, 2010, when the Church split into two distinct groups, was the organizational structure of the Church of the Firstborn hierarchical or congregational for the sole purpose of ownership and control of property?

The jury answered this question with a single word: "Hierarchical."

### Post-trial proceedings

After the trial court entered an order on the jury verdict, the Brewer parties (plaintiffs in the 2018 case) and the "Corporation Defendants"[2] (defendants in the 2011

---

[2] "Corporation Defendants" refers to the Corporation and the Academy.

case) filed a motion for judgment notwithstanding the verdict or for a new trial. The trial court denied this motion in an order entered on December 9, 2019.

In April 2020, the Slagle parties filed a motion for partial summary judgment in the 2018 and 2011 cases. They argued, in part, that the jury verdict "requires this Court to defer to the Board of Deacons as its highest authority in any ecclesiastical question or polity issue, including control of the Properties or in designation of membership." The Brewer parties also filed a motion for summary judgment in April 2020. They asserted that "the remaining issues in this case are not justiciable under the ecclesiastical abstention doctrine and, therefore, this Court lacks subject matter jurisdiction to resolve them."

In an order entered in November 2020, the trial court granted the Slagle parties' motion for partial summary judgment in the 2011 and 2018 cases. The court denied the motion for partial summary judgment in the 2018 case filed by the Brewer parties and the Corporate Defendants. The court stated that the only remaining issue was the amount of damages, if any, owed by "the original Defendants to the original Plaintiffs." The court referred this issue to a special master to make findings of fact and conclusions of law and file a report with the court.

The parties then proceeded to file motions to define the scope of evidence to be heard at the damages hearing. The parties submitted volumes of evidence for consideration by the special master. A hearing on damages was conducted by the special master on March 29, 2022. The special master's report was filed with the court on August 26, 2022, and included a total damages award of $1,230,947 to the Slagle parties from the Brewer parties.

Chancellor Ben Dean replaced Chancellor Laurence McMillan in the Robertson County chancery court in September 2022. That month, the Corporate Defendants filed objections to the special master's report and a motion "for review and reconsideration, and request for reconsideration" of the trial court's November 2020 order granting partial summary judgment to the Slagle parties. The Slagle parties filed a motion seeking clarification from the special master in order to correct some asserted "inadvertent errors" in the special master's report that needed correction before the trial court considered the objections filed by the 2011 defendants. The Corporate Defendants filed a motion to strike the motion to clarify the master's report, which the trial court denied. In December 2022, the Brewer parties and the Corporate Defendants filed a "Motion to Reconsider Decision on Motion for Judgment Notwithstanding the Verdict or in the Alternative for a New Trial."

After extensive briefing, the trial court held a hearing on February 6, 2023, on the motion to reconsider the trial court's November 12, 2020 order (granting partial summary judgment to the Slagle parties), the objections to the special master's report and recommendation, and the motion for clarification of the special master's report. In an order entered an order on March 7, 2023, the trial court set aside the November 2020 order on the ground that it "did not make any specific findings of fact beyond recitation of the jury's

verdict and the verdict fails to address specifically what body of the Church hierarchy is in control or ownership of the church property." The court concluded that "it was inappropriate for the Trial Court to make a finding of liability based on the limited Jury verdict" and vacated the reference to the special master on the issue of damages. The court declined to set aside the jury verdict and reserved the issue "for further determination as this matter proceeds forward toward another trial." After making these determinations regarding the previous proceedings, the court directed "the parties and each faction in this matter, to add as parties to this action the persons who each faction contends represent and constitute the Trustees of the Church," finding that it was necessary that the trustees at the time of the schism and the trustees appointed by the "Slagle faction after the division of the church" be added as parties. Further, the court directed the parties to file motions for summary judgment to address a list of issues.

The trial court's March 2023 order was followed by extensive filings by the parties, including competing motions for summary judgment. The trial court held a hearing on the motions for summary judgment in November 2023. On August 14, 2024, the trial court entered an Analysis of Statement of Facts including "analysis and findings with regard to the Statement of Facts submitted by both parties, with the Court's findings as to each submitted fact." The same day, the court entered a memorandum opinion and a final order granting the Brewer parties' and Corporate Defendants' motion to reconsider the December 2019 order denying their motion for judgment notwithstanding the verdict or for a new trial; vacating the jury verdict; granting in part and denying in part the Brewer parties' motion for summary judgment; and denying the Slagle parties' motion for partial summary judgment. The court included a detailed ruling regarding the means of resolving the property dispute. The Slagle parties have appealed.

<u>Issues on appeal</u>

The Slagle parties ask this Court to address the following issues:

1. Whether the trial court erred in setting aside the 2020 grant of partial summary judgment to the Slagle parties.
2. Whether the trial court erred in setting aside the jury verdict and in denying the Slagle parties' motion for partial summary judgment.
3. Whether the trial court erred in granting the Brewer parties' motion for summary judgment.

ANALYSIS

I.      Setting aside the jury verdict

We begin by examining the trial court's decision to set aside the jury verdict. The trial court granted a motion filed by the Brewer parties and the Corporate Defendants

- 17 -

entitled "Motion to Reconsider Decision on Motion for Judgment Notwithstanding the Verdict or in the Alternative for a New Trial." In a memorandum opinion consisting of over 100 pages, the trial court analyzed the jury trial and the previous chancellor's rulings and concluded that "the jury's verdict as to hierarchical governance, insofar as it is applied to internal governance and authority over the parent church and parent church property[,] is not supported by the evidence." For the reasons outlined below, we have determined that the trial court erred in granting the December 2022 motion and overturning the jury verdict.

The procedural history is significant here. After the jury trial in August 2019, the Brewer parties and the Corporate Defendants filed a timely motion for judgment notwithstanding the verdict or for a new trial. The trial court denied these motions in an order entered on December 9, 2019. The motion at issue here, filed in December 2022, asked the trial court to reconsider the previous denial of these same motions. In its August 14, 2024 order, the trial court undertook an exhaustive analysis of the jury trial proceedings and the previous chancellor's evidentiary rulings and reached the following conclusions:

> Having certified familiarity with the record, the Court, sitting as 13[th] juror as well as entertaining the Motion for a New Trial and for a Judgment notwithstanding the verdict, finds that the jury's verdict is not supported by the evidence, is tainted by the admission of evidence in violation of the Ecclesiastical Abstention Doctrine and must be vacated. The Court having previously entered its detailed order and analysis of the jury's verdict and having set aside the summary judgment order, the Court finds there is little to no admissible evidence in the record to support the verdict. The jury was merely asked to label the Church as hierarchical or congregational for the purposes of ownership and control of property—it was not asked to identify who within any hierarchy actually controlled the Church's property.

(Footnotes omitted).

To support the trial court's authority to grant their motion, the Brewer appellees[3] rely on Tennessee Rule of Civil Procedure 63, entitled "Inability of a Judge to Proceed." Rule 63 states:

> If a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties. In a trial or hearing without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify again without undue

---

[3] The Brewer parties and the Corporate Defendants are the appellees.

burden. In any trial or hearing, with or without a jury, the successor judge may recall any witness.

We do not consider Rule 63 applicable here because Judge McMillan completed the jury trial and post-trial motions. This is not a case where a successor judge is taking over during or immediately after a trial—i.e., this is not a situation where "a trial or hearing has been commenced and the judge is unable to proceed." Rather, the procedural posture here is that the jury trial and post-trial motions were completed several years before a new chancellor took office, and further proceedings remained.

Our Supreme Court has held that Rule 54.02, rather than Rule 59,[4] is the operative rule where a party is seeking relief from an interlocutory order. *Discover Bank v. Morgan*, 363 S.W.3d 479, 488 (Tenn. 2012) (involving a motion for relief from an order of default judgment that did not adjudicate all of the claims, rights, and liabilities of the parties). Rule 54.02 states, in pertinent part:

> When more than one claim for relief is present in an action, whether as a claim, counterclaim, cross-claim, or third party claim, or when multiple parties are involved, the Court, whether at law or in equity, may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, *any order or other form of decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of the judgment adjudicating all the claims and the rights and liabilities of all the parties.*

TENN. R. CIV. P. 54.02(1) (emphasis added). Thus, the motion at issue is, in essence, a motion to revise a non-final order pursuant to Tenn. R. Civ. P. 54.02.

The standard of appellate review on a motion to revise is the abuse of discretion standard. *Discover Bank*, 363 S.W.3d at 487. Therefore, the following principles apply:

> An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable

---

[4] Tennessee Rule of Civil Procedure 59 governs post-trial motions for judgment notwithstanding the verdict and motions for a new trial. TENN. R. CIV. P. 59.01.

decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

*Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 305 (Tenn. 2020) (citation modified).

What are the standards to be applied by a trial judge in ruling on a motion to revise an interlocutory order under Rule 54.02? Motions to revise an interlocutory order can conceivably request varying bases for revision, and previous decisions have looked to the nature of the particular motion and the principles applicable to similar motions in the context of final judgments. *See Discover Bank*, 363 S.W.3d at 491 (evaluating a motion to revise a non-final default judgment under the test applicable to Rule 60 motions for relief from default judgments on grounds of excusable neglect); *Harris v. Chern*, 33 S.W.3d 741, 743-44 (Tenn. 2000) (evaluating a motion to revise a grant of summary judgment using principles applicable to a Rule 59.04 motion to alter or amend). In the present case, the motion to revise is most analogous to a motion for a new trial or for judgment notwithstanding the verdict, under Tenn. R. Civ. P. 59, with the difference being the non-final nature of the trial court's order.

A motion for judgment notwithstanding the verdict "'is the procedural device whereby the trial court substitutes its judgment for the jury's verdict to the contrary.'" *Goree v. United Parcel Serv., Inc.*, 490 S.W.3d 413, 429 (Tenn. Ct. App. 2015) (quoting *Payne v. CSX Transp., Inc.*, 467 S.W.3d 413, 437 (Tenn. 2015)). In ruling on a motion for judgment notwithstanding the verdict (as with a motion for a directed verdict), "both the trial court and the appellate court are required to review the record, discard all countervailing evidence, take the strongest legitimate view of the evidence in favor of the non-moving party, and allow all reasonable inferences in his favor." *Mairose v. Fed. Exp. Corp.*, 86 S.W.3d 502, 511 (Tenn. Ct. App. 2001). The following principles apply with respect to a trial court's ruling on a motion for a new trial:

> In Tennessee, a judge presiding over a jury trial has a duty not only to sit as judge, but must also sit as a thirteenth juror who independently reviews and weighs the evidence at trial. *Holden v. Rannick*, 682 S.W.2d 903, 904-05 (Tenn. 1984). If the trial court is dissatisfied with the jury's verdict or disagrees with the jury as to the weight of the evidence, it must order a new trial. Tenn. R. Civ. P. 59.06; *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 420 (Tenn. 2013) (citing *Jones v. Idles*, 114 S.W.3d 911, 914– 15 (Tenn. 2003)). The trial judge cannot simply defer to the jury's decision but must make an independent judgment. *Holden*, 682 S.W.2d at 906; *Bradley v. Bishop*, 538 S.W.3d 518, 536 (Tenn. Ct. App. 2017) (citing *Dickey v. McCord*, 63 S.W.3d 714, 718–19 (Tenn. Ct. App. 2001)). No verdict is valid unless it is approved by the trial judge acting as a thirteenth juror.

*Fam. Tr. Servs. LLC v. Green Wise Homes LLC*, 693 S.W.3d 284, 297 (Tenn. 2024). When acting as thirteenth juror, "'the trial court must independently weigh the evidence, determine the issues presented, and decide whether the jury's verdict is supported by the evidence.'" *Bradley v. Bishop*, 538 S.W.3d 518, 536 (Tenn. Ct. App. 2017) (quoting *Dickey v. McCord*, 63 S.W.3d 714, 718 (Tenn. Ct. App. 2001)).

Tennessee Rule of Civil Procedure 59 applies to a motion "under Rule 50.02 for judgment in accordance with a motion for a directed verdict" (a motion for judgment notwithstanding the verdict) and a Rule 59.07 motion for a new trial. The Rule expressly states that "[m]otions to reconsider any of these motions are not authorized and will not operate to extend the time for appellate proceedings." TENN. R. CIV. P. 59.01. The purpose of the rule against successive Rule 59 motions is "to bring finality to proceedings in the trial court when the trial judge has ruled upon any of the listed motions." *Daugherty v. Lumbermen's Underwriting All.*, 798 S.W.2d 754, 758 (Tenn. 1990); *see also Parks v. Mid-Atl. Fin. Co., Inc.*, 343 S.W.3d 792, 799 (Tenn. Ct. App. 2011).

Tennessee Rule of Civil Procedure 54.02 generally authorizes a trial court to revise interlocutory orders. Unlike Rule 59, Rule 54.02 does not expressly prohibit successive motions to revise or provide a time limit on such motions. We do not, however, believe that Rule 54.02 was intended to allow the action taken by the trial court here. Rule 54.02 does not contemplate the unique procedural posture at issue in this case—when the judge overseeing a jury trial has fulfilled the role of thirteenth juror and ruled that the jury's verdict on a specific factual issue was supported by the evidence, and a successor judge later decides to reexamine the original judge's decision and overturn the jury verdict. Even if we assume that Rule 54.02, by its terms, gives a successor judge the authority to act in this circumstance, we find the trial court's actions in this case to be an abuse of discretion. On the factual issue[5] presented to the jury—whether the Church's organizational structure was hierarchical or congregational "for the sole purpose of ownership and control of property of the Church"—the jury rendered its verdict and the trial court, which heard all of the testimony and could evaluate the witnesses' credibility, affirmed the verdict. For a successor judge to reevaluate and overturn the original judge's denial of post-trial motions challenging the jury's factual determination "causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard [and] (2) reaching an illogical or unreasonable decision." *Harmon*, 594 S.W.3d at 305.

---

[5] This Court previously determined that there were disputed material facts concerning "whether the Church was hierarchical or congregational" for purposes of the ownership and control of property. *COFB II*, 2017 WL 3382800, at *9. That determination is the law of the case. *See Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998) ("[W]hen an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court . . . .").

II.     Setting aside the 2020 grant of partial summary judgment to the Slagle parties

Next, we must consider whether the trial court erred in setting aside Chancellor McMillan's 2020 grant of partial summary judgment to the Slagle parties. For the reasons discussed below, we have determined that the trial court's decision to set aside the previous summary judgment order was in error.

We find it helpful to review the context in which the trial court decided to set aside the former chancellor's partial summary judgment order. After the jury verdict order and the trial court's denial of post-trial motions requesting relief from the jury verdict, the Slagle parties filed a motion for partial summary judgment in both the 2011 case (Slagle parties versus the Corporate Defendants) and the 2018 case (Brewer parties versus Slagle parties), asserting that "there remain no genuine issues of material fact other than the appropriate measure of damages awarded." The Brewer parties filed a motion for summary judgment in the consolidated cases, setting out three outstanding issues identified by the court at a judicial status conference:

(1) What is the internal structure of the hierarchy of the Church; and
(2) Who are the members of the Church; and
(3) Was there a withdrawal by the Brewer Parties or Slagle Parties from the Church.

The Brewer parties took the position that, under the ecclesiastical abstention doctrine, the trial court did not have subject matter jurisdiction to decide these issues.

On November 12, 2020, the trial court entered an order granting the Slagle parties' motion and denying the Brewer parties' motion. In the order granting partial summary judgment entered in November 2020, the court gave the following legal grounds for its ruling:

1. The jury, duly empaneled to try this case, returned a verdict on August 27, 2019 finding that the Church was [hierarchical] in governance with regard to the ownership and control of real property.
2. The hierarchical authority for the original Plaintiff, Church of the Firstborn, vested in the Board of Deacons prior to the church split on November 21, 2010.
3. The original corporate Defendants [in the 2011 case] lack standing to quiet title to Church's real property.
4. The abstention doctrine prohibits this court from deciding ecclesiastical or polity issues existing among the various litigants, to include church membership.

5. Title to real property vests in the Board of Deacons of the unincorporated church association, as that board was constituted prior to November 21, 2010.

6. There are no genuine issues of material fact and the "Slagle parties" are entitled to a partial judgment as a matter of law.

After the trial court entered this order in November 2020, there was no motion by the Brewer parties or the Corporate Defendants to amend or revise this order.

Now, we jump forward approximately two years, after a new chancellor took the bench in August 2022. In September 2022, the Corporation and the Academy filed a combined pleading entitled "Objection to Special Master Report, Motion for Review and Reconsideration, and Request for Reconsideration of Partial Summary Judgment Ruling." This motion focuses on the following assertions concerning alleged errors in the special master's report on damages and the parties against whom damages were assessed:

1. "The Slagle Parties have not asserted a claim for unjust enrichment against Dayspring Academy."
2. "Dayspring Academy has not wrongfully possessed the School Building."
3. "The Slagle Parties proof related to damages for alleged wrongful possession is woefully deficient."
4. "The Slagle Parties are not entitled to a monetary award for the alleged disrepair of the School Building."

These arguments addressed supposed inaccuracies in the special master's report, not the trial court's grant of partial summary judgment. Yet, in the concluding paragraph of their motion, the movants request that the court reject the special master's report and "reconsider Chancellor McMillan's flawed and imprecise Summary Judgment Order to address the numerous issues identified in this filing and others before the Court, including those identified in the Court of Appeal's February 18, 2022 order in the 2018 Action."

The new chancellor granted the Corporate Defendants' motion and set aside the November 2020 order in an order entered in March 2023. In so doing, the trial court made the following findings:

- "The Court finds that this finding by the Court [the November 2020 finding that the 'hierarchical authority for the original Plaintiff Church of the Firstborn, vested in the Board of Deacons prior to the Church split on November 21, 2010'] is a conclusory finding which is not supported by any citation to the record of any undisputed facts, or any law (here neutral principles of law, or analysis under the shifting Summary Judgment burdens) that supports such a conclusion of fact and law."

- 23 -

- "The Court finds that this [the November 2020 finding that title vested in the Board of Deacons as constituted prior to November 21, 2010] likewise is a conclusory finding which is not supported by any citation to the record of any undisputed facts, or any law . . . that supports such a conclusion of fact and law."
- The Court found that "various standing and authority issues abound" because of the Court of Appeals holding that the Corporation lacked standing and that, "This is yet another factual/legal dispute that exists for the determination by the Court/Trier of Fact and which remains unresolved by the verdict or Partial Summary Judgment Order."
- The Court found that disputed issues of fact and law remained on two arguments: "incorporation [the creation of the Corporation] equating to leaving the church vs. incorporation being ineffective, but not an abandonment of [the Brewer parties'] rights, role and standing in the Unincorporated Association," and that these issues needed to be determined to the extent possible "without encroaching into matters that are forbidden by the ecclesiastical abstention doctrine."
- "The Court also notes that there are issues as to whether the Slagle faction has legal authority (and if so, possibly the broader issue of standing) to pursue an action derivatively on behalf of the Church or directly themselves in their individual capacities . . . . The Court is cognizant that the Slagle parties are only seeking damages in this matter against the Church Corporation that has been declared to lack standing and is not seeking money damages as against any of the other Brewer parties/faction."
- The Court also found "various disputes as to authority to appoint deacons and trustees and pastor/elder overseer."
- The Court stated that it "is highly doubtful that the Order for Partial Summary Judgment entered by Chancellor McMillan would survive an appeal" due to the "absence of any analysis of facts or identification of neutral principles of law" regarding the court's application of the ecclesiastical abstention doctrine.
- The Court found that the "purported bylaws/governing documents are inextricably intertwined with scriptures" and opined that "[t]he issue of determination of what constitutes the binding governing documents may itself implicate the ecclesiastical abstention doctrine."
- The Court found that the "order granting partial summary judgment lacks sufficient detail as to factual or legal basis for decision."

Having made all of these findings, the trial court concluded that, because of the previous chancellor's failure to make specific factual findings and the jury verdict's failure to "address specifically what body of the Church hierarchy is in control or ownership of the church property, the Court is compelled to set aside the prior Order Granting of Partial Summary Judgment [sic] entered on November 12, 2020."

We begin by considering the procedural basis for the trial court's decision to set aside the partial summary judgment order. The motion asked the court to "reconsider" the prior chancellor's order. As discussed above, Tenn. R. Civ. P. 54.02 authorizes a trial court to revise an interlocutory order. In *Harris v. Chern*, the Court considered a "motion to reconsider" a trial court's order granting partial summary judgment. 33 S.W.3d at 744. The Court clarified that a motion to revise pursuant to Rule 54.02, rather than a motion to alter or amend pursuant to Rule 59.04, is the appropriate rule when the judgment at issue is not final. The Court found that cases interpreting Rule 59.04 offered guidance:

> Our research reveals no Tennessee case law regarding the standard a trial court should apply in ruling on a Rule 54.02 motion to revise. Cases analyzing Rule 59.04 motions to alter or amend, however, offer some guidance in determining the standard for revising non-final orders. *See Thomas v. Swindle*, 676 So.2d 333, 335 (Ala. Civ. App. 1996) (finding "caselaw concerning Rule 59 motions to be persuasive authority" in interpreting Rule 54 motions). While the rules are not synonymous, they are similar in intent and operation. They differ in that Rule 59.04 addresses final judgments and requires a motion to alter or amend to be made within 30 days of the entry of judgment. In contrast, Rule 54.02 addresses interlocutory orders. Rule 54.02 confers upon the trial court "the privilege of reversing itself up to and including the date of entry of a final judgment." *Louis Dreyfus Corp. v. Austin Co.*, 868 S.W.2d 649, 653 (Tenn. Ct. App. 1993). Both rules, however, afford litigants a limited opportunity to readdress previously determined issues and afford trial courts an opportunity to revisit and reverse their own decisions.

*Id.* The motion at issue in *Harris* involved the submission of additional evidence, and the Court adopted a balancing test drawn from cases on the admission of additional evidence under Rule 59. *Id.* at 745.

In the present case, it is not a question of the litigants offering additional evidence to the court. The general standard applicable to motions to alter or amend under Rule 59.04 has been summarized as follows:

> "The purpose of a Rule 59.04 motion to alter or amend a judgment is to provide the trial court with an opportunity to correct errors before the judgment becomes final. *Bradley v. McLeod*, 984 S.W.2d 929, 933 (Tenn. Ct. App. 1998) (overruled in part on other grounds by *Harris v. Chern*, 33 S.W.3d 741 (Tenn. 2000)). The motion should be granted when the controlling law changes before the judgment becomes final; when previously unavailable evidence becomes available; or to correct a clear error of law or to prevent injustice. *Id.* A Rule 59 motion should not be used to raise or present new, previously untried or unasserted theories or legal arguments.

- 25 -

*Local Union 760 of Intern. Broth. of Elec. Workers v. City of Harriman*, No. E2000-00367-COA-R3CV, 2000 WL 1801856, at *4 (Tenn. Ct. App. Dec. 8, 2000) *perm. app. denied* (Tenn. May 14, 2001), *see Bradley*, 984 S.W.2d at 933 (holding: a Rule 59 motion should not be used to raise new legal theories where motion for summary judgment is pending)."

*Kirk v. Kirk*, 447 S.W.3d 861, 869 (Tenn. Ct. App. 2013) (quoting *In re M.L.D.*, 182 S.W.3d 890, 895 (Tenn. Ct. App. 2005)). Moreover, "Rule 59.04 motions are not opportunities to re-litigate the issues previously adjudicated at trial." *Burris v. Burris*, 512 S.W.3d 239, 247 (Tenn. Ct. App. 2016).

This is not a case in which the controlling law has changed or in which newly discovered evidence has been presented. We agree that the new chancellor had the authority to alter or amend the November 2020 grant of summary judgment "to correct a clear error of law or to prevent injustice." However, by setting aside the order entirely, the trial court essentially gave the movants the opportunity to "re-litigate the issues previously adjudicated at trial" and in the extensive arguments preceding the trial court's grant of partial summary judgment in November 2020. *Id.*

In *COFB II*, this Court described the factual disputes remaining at that stage of the litigation:

> The Church Corporation and Dayspring Academy argue that "control over the Church's real property require[d] a congregational vote." In support, they cite to specific examples of congregational votes taken before a property transfer. But they have also stated that "the Church ha[d] employed a number of methods when making real property decisions," including "(i) by congregational vote upon the recommendation of the Elder, (ii) by congregational vote upon a vote of recommendations by deacons, and (iii) for minor Church properties, by vote of the deacons upon recommendation of the Elder."
> The Slagle Plaintiffs argue that the bylaws allegedly drafted by Elder P.D. Hardin "vest[ed] all business authority in the Board of Deacons." Beyond the bylaws, they argue that there was "a consistent practice of votes [by the Board of Deacons] to approve property transactions." And, contrary to the factual assertion of the Church Corporation and Dayspring Academy, they submit Church records establish "consistent practices" for dealing with property. They acknowledge that Church member votes took place but claim those only occurred after deacon approval. According to the Slagle Plaintiffs, the only instances "of self-autonomous congregational authority" occurred with the sale of properties where members worshiped, which required approval by "a super-majority (two-thirds) of any individual congregation" impacted.

2017 WL 3382800, at *9 (footnote omitted). At the subsequent jury trial, these two factual scenarios were presented to the jury, and the jury sided with the Slagle parties, finding that control over Church property rested with the board of deacons.[6] The trial court made this clear in its order granting partial summary judgment. We respectfully disagree with the trial court's statements in its March 2023 order to the effect that the jury's verdict did not resolve which body within the Church controlled property decisions. The jury accepted the Slagle parties' proof that the practice and history of the Church was for the elder/overseer to be in charge of the religious doctrine and the board of deacons to be in charge of the business of the Church, including property decisions. Admittedly, the governance of this church was informal, and there was conflicting proof concerning how property decisions had been made over the years. The jury saw the witnesses, assessed their credibility, and adopted the view presented by the Slagle parties. In addition to resolving the internal structure of the Church, the court, in its November 2020 order, declined, under the ecclesiastical abstention doctrine, to decide "ecclesiastical or polity issues existing among the various litigants, to include church membership."

Because we have determined that the trial court erred in setting aside the November 2020 grant of partial summary judgment, the matter is remanded to the trial court to proceed with ruling on the motions and objections related to the special master's report. All other issues raised on appeal are pretermitted.

CONCLUSION

The judgment of the trial court is reversed and remanded. Costs of this appeal are assessed against the appellees, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

---

[6] There is no dispute that the trustees held the property in trust for the Church.